IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 4, 2022

IN RE ANALESIA Q.[1]

**Appeal from the Juvenile Court for Cocke County**
**No. TPR - 05656     Brad Lewis Davidson, Judge**

_____

**No. E2021-00765-COA-R3-PT**
_____

The Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Cindy B. ("Mother") and Francisco Q. ("Father") to their minor daughter, Analesia Q. (the "Child"). Following a bench trial, both parents' rights were terminated pursuant to several statutory grounds, and Father appeals. He challenges the statutory grounds for termination, the trial court's finding that termination of his rights was in the Child's best interests, and the trial court's decision to admit hearsay testimony regarding potential abuse of the Child pursuant to Tenn. R. Evid. 803(25). We reverse the trial court's decision to terminate Father's parental rights for abandonment by failure to visit and severe abuse, and vacate the trial court's decision to terminate Father's parental rights for failure to manifest an ability and willingness to assume custody or financial responsibility of the Child. We affirm the termination of Father's parental rights as to the remaining grounds, as well as the holding that termination of Father's parental rights is in the Child's best interests. The ultimate decision of the trial court is therefore affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in**
**Part; Reversed in Part; Vacated in Part; Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and W. NEAL MCBRAYER, J., joined.

Brett Cole, Seymour, Tennessee, for the appellant, Francisco Q.

Herbert H. Slatery III, Attorney General and Reporter, and Amber L. Barker, Assistant Attorney General for the appellee, Tennessee Department of Children's Services.

_____
[1] In actions involving juveniles, it is this Court's policy to protect the privacy of the children by using only the first name and last initial, or only the initials, of the parties involved. In the record before us, the Child at issue is referred to as both "Analesia" and "Analicia." The Child's birth certificate displays the name "Analesia," and that is the name we use here.

# OPINION

## BACKGROUND

The Child was first removed from Mother[2] shortly after the Child's birth. The Child was born prematurely and with opiates, morphine, and hydromorphone in her system. On May 27, 2016, DCS filed a petition in the Juvenile Court for Cocke County (the "trial court") to transfer legal custody to Father. The trial court granted DCS's request and entered an order placing the Child in Father's custody on May 31, 2016. The Child was later adjudicated dependent and neglected as to Mother, but Mother was allowed supervised visitation with the Child. Father was to supervise the visitation, and Mother was not allowed to have overnight visitation with the Child. An order was entered on October 27, 2016, providing that the case was closed.

A new dependency and neglect action was filed against Father on August 2, 2019. The petition alleged that DCS had received new referrals of drug use and environmental neglect regarding the Child; that a case worker found the family living in the home of a known methamphetamine user; and that Mother and Father left the house on foot before the case worker could finish speaking to them. The petition explained that when the case worker made contact with Father several days later, he tested negative for all substances, but then failed to attend another scheduled meeting with the case worker to complete an assessment. The trial court entered an order on August 2, 2019, finding probable cause to believe that the Child was dependent and neglected in Father's care and noting that Father was refusing to work with DCS and keep his appointments. The order required Father to complete the following tasks: 1) schedule and attend a mental health assessment and provide DCS with proof of same; 2) schedule and attend a drug and alcohol assessment and provide DCS with proof of same; 3) submit to random drug tests and pill counts; 4) maintain weekly contact with DCS; 5) comply with all DCS in-home service provider requests; 6) resolve all current legal issues and refrain from incurring new criminal charges; 7) obtain and maintain a safe and legal transportation plan; 8) obtain and maintain safe and appropriate housing; 9) obtain and maintain a legal source of income; 10) follow all court orders related to Mother; and 11) provide copies of the trial court's order to any and all providers to ensure compliance.

The record contains a Family Permanency Plan dated December 30, 2019 (the "Plan") with largely the same requirements plus additional requirements. The Plan also required Father to complete a parenting class; attend 4.5 hours per month of supervised visitation with the Child; resolve issues related to Father's immigration status; provide proof of income including paystubs and/or W2s; allow DCS to perform a home

---

[2] Mother's parental rights were also terminated by the trial court, but Mother has not appealed.

inspection in any future residences; and pay child support.[3]

Following her removal from Father, the Child was placed briefly with a family member. An order entered September 17, 2019, transferred temporary custody to a foster family. The Child struggled in that placement, however, and had to be removed from the home. The foster parents reported that the Child was aggressive towards other children in the home, including slapping and biting them. The Child also attempted to put her hands down another child's pants. In the meantime, the Child was adjudicated dependent and neglected per an order entered on October 22, 2019. According to this order, Father was still dealing with criminal charges for "aggressive panhandling" and had not obtained housing. In December of 2019, the Child was placed with another foster family (the "Foster Family"), where she remained at the time of trial. The foster parents were also fostering another child of Mother's, the Child's half-brother.

The record does not reveal that much occurred in the case in the early months of 2020. It is undisputed, however, that Father was limited to phone calls with the Child during this time due to COVID-19 restrictions. DCS eventually filed its petition to terminate Father's parental rights on September 10, 2020, alleging the following statutory grounds: 1) abandonment by failure to visit; 2) abandonment by failure to support; 3) substantial noncompliance with the Plan; 4) severe child abuse; and 5) failure to manifest an ability and willingness to assume custody or financial responsibility for the Child. The severe abuse allegations arose from behavior exhibited by the Child during her foster care placements as well as various disclosures made by the Child to her current foster mother ("Foster Mother"). The petition also alleged that termination of Father's parental rights was in the Child's best interests.

Trial was held on June 22, 2021. Witnesses included Father, Foster Mother, and DCS case manager Michelle Eyler.[4] Regarding Father, Ms. Eyler testified generally that Father had not completed the tasks in the Plan and that Father had not initiated communication with her in a long time. While Ms. Eyler acknowledged that Father may have completed some tasks, such as a drug and alcohol assessment, she had not received verification of that. Rather, Ms. Eyler indicated that at one point Father told her he was unable to complete the Plan because he worked all day. Regarding the four-month period before the petition for termination was filed, Ms. Eyler testified that Father had one phone call with the Child in May of 2020 but missed several others. She also testified that Father had not paid any support for the Child since her removal from his custody and that Father claimed to be working but had never provided proof of his employment to DCS. Regarding the Child's current placement, Ms. Eyler testified that the Child was bonded to the Foster Family and that they wished to adopt the Child. Ms. Eyler also noted that the Child's half-brother had already been adopted by the family.

---

[3] This plan was ratified by the trial court on March 10, 2020.
[4] In the transcript, Ms. Eyler is listed as "Michelle Ailor." In the pleadings in the technical record, however, she signs her name as "Michelle Eyler."

Both Ms. Eyler and Foster Mother testified that the Child does not ask about either Mother or Father. Foster Mother also testified as to disclosures of abuse made by the Child regarding both Father and Mother, to which Father's counsel objected. Specifically, Foster Mother maintained that on two separate occasions, the Child told Foster Mother that "Franco likes my whooha." Both Foster Mother and Ms. Eyler testified that the Child called Mother and Father "Cindy" and "Franco," respectively.

Regarding Father's phone calls to the Child, Foster Mother testified as follows:

Q. Let's move on and talk about some of the telephone visits that have occurred. You supervised telephone visits with the [F]ather; is that correct?

A. Yes, I did.

Q. Ms. [Eyler] testified that you kept a log of those phone visits with her; is that correct?

A. I did.

Q. And do you have that with you today?

A. I do not. I didn't bring it.

Q. I can tell by your face that you did not. That's okay. Can you approximate how many phone calls the [F]ather made?

A. Approximately eight or nine.

Q. So to your recollection eight or nine calls.

A. Yes.

Q. Do you recall what the last date, or around when that would have been when he called?

A. I believe it was the end of July, first of August somewhere in there it seems like but I can't be positive.

Q. And that was 2020?

A. Yes.

- 4 -

Q. But you did record all of those in your logs, didn't you?
A. Yes, I did.

This was the extent of Foster Mother's testimony regarding Father's phone calls to the Child. Foster Mother also indicated, however, that the Child would often exhibit behavioral problems and/or regression after her phone calls with Father. Foster Mother's overall opinion was that the Child did not exhibit a bond to either of her parents and that the Child was more bonded to the Foster Family.

Lastly, the trial court heard from Father, who denied that the Child ever called him "Franco." Rather, Father maintained that the Child always referred to him as "daddy" and that no one else had ever referred to him as "Franco." Father also testified that in the four-month period prior to the filing of the petition, he was living with friends in Morristown and working for a contractor a few days a week. Father claimed that he eventually stopped making phone calls to the Child because someone from DCS told him to stop calling.[5] Generally, Father maintained that he had a difficult time working with DCS because the assessments and classes it required were cost-prohibitive and because he was not provided a translator during child and family team meetings ("CFTM").[6] Father testified that he had a difficult time following the Plan because it was written in English. He stated that he completed an in-home alcohol and drug assessment and that the provider was supposed to send proof of completion to DCS. As of the time of trial, Father claimed to have a new job in commercial roofing and to be working forty to sixty hours per week making sixteen dollars per hour. While Father testified that he had the present ability to rent a house suitable for the Child, he also conceded that he was currently living with acquaintances and that he was unable to assume custody of the Child that day. Father adamantly denied all abuse allegations.

The trial court entered an order terminating Father's parental rights on July 6, 2021. The trial court found that DCS proved all of the alleged grounds for termination by clear and convincing evidence and that termination of Father's parental rights was in the Child's best interests. Father filed a timely notice of appeal to this Court.

## ISSUES

1.      Whether the trial court erred in finding that clear and convincing evidence supported the statutory grounds for termination of Father's parental rights.

---

[5] It is undisputed that at some point, a no-contact order was entered against Father prohibiting him from communicating with the Child; however, this order is not in the record, and the parties seem to agree that the order went into effect after the filing of the petition.

[6] A translator was used at trial. Ms. Eyler claimed at trial that Father was responsive during the CFTMs and never asked for a translator. She also claimed that she and Father texted back and forth in English.

2.     Whether the trial court erred in admitting hearsay testimony pursuant to Tenn. R. Evid. 803(25).

3.     Whether the trial court correctly concluded that termination of Father's parental rights was in the Child's best interests.

### STANDARD OF REVIEW

Our Supreme Court has explained that:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182

S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523–24.

## DISCUSSION

### I. Grounds for Termination

The trial court terminated Father's parental rights pursuant to five statutory grounds. We address each ground in turn.

#### A. Severe Abuse

Parental rights may be terminated for severe child abuse. *See* Tenn. Code Ann. § 36-1-113(g)(4); Tenn. Code Ann. § 37-1-102. Here, DCS plead severe abuse in its petition, and the trial court found that this ground was proven at trial. Father challenges this decision on appeal, and DCS concedes that this ground should be reversed.[7] We

---

[7] As DCS explains in its brief:

"Where the statute provides several possible definitions for a ground, the trial

- 7 -

therefore reverse this ground for termination. *See In re Jayce D.*, No. M2021-00539-COA-R3-PT, 2022 WL 817605, at \*12 (Tenn. Ct. App. Mar. 18, 2022) (explaining that this Court need not consider the merits of a ground for termination when the party seeking termination does not defend the ground on appeal); *see also In re Zane W.*, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at \*7 (Tenn. Ct. App. July 6, 2017) (noting that reversing a ground not challenged by DCS does not "run afoul of the Tennessee Supreme Court's decision in *In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016)," because that case "has never been construed to require this Court to also consider the grounds sustained by the trial court and thereafter conceded or waived by the non-parent on appeal").

## B. Abandonment

The trial court also found that Father's rights should be terminated based on abandonment. *See* Tenn. Code Ann. § 36-1-113(g)(1). Abandonment occurs when

> [f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). Here, the trial court found that Father abandoned

court must specify the exact definition that it relies upon in reaching its ultimate conclusion. In the absence of such specificity, this Court cannot conduct a meaningful appellate review." *In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499, at \*12 (Tenn. Ct. App. Nov. 16, 2015) (vacating and remanding severe abuse ground where the trial court did not identify the "exact definition(s) relied upon"), *no perm. app. filed*. The ground of severe abuse in this case was not *res judicata* and was tried during the termination trial, requiring the juvenile court to identify the exact definition of severe abuse it relied upon. Because the written order merely identified "§ 36-1-113(g)(4) and §37-1-102(b)(27)" (I, 34-35), and no definition was identified in the court's oral ruling and no specific definition can be easily discerned from the court's ruling (II, 166-67), this Court cannot meaningfully review this ground. *See In re L.F.*, No. M2020-01663-COA-R3-PT, 2021 WL 3782130, at \*12 (Tenn. Ct. App. Aug. 26, 2021) (reversing ground where "[t]he trial court only generally mentioned that [f]ather 'sexually abused' the child . . ., and it referenced only 36-1-113(g)(4) and 37-1-102(b)(27)"), *no perm. app. filed*.

While DCS concedes the ground of severe abuse, it argues in its brief that the trial court did not err in admitting Foster Mother's hearsay testimony regarding the Child's disclosures of abuse because that testimony is relevant to the Child's best interests. As such, this issue is addressed *infra* as part of the best interests analysis.

the Child through his failure to support and his failure to visit the Child in the four months immediately preceding the filing of the petition. Following our review of the record, we conclude that clear and convincing evidence does not support the conclusion that Father failed to visit the Child. Clear and convincing evidence does support, however, the conclusion that Father failed to support the Child.

### 1. *Abandonment by Failure to Support*

Abandonment through failure to support occurs when a parent fails, "for a period of four (4) consecutive months, to provide monetary support or . . . more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is support that, "under the circumstances of the individual case, is insignificant given the parent's means[.]" *Id.* § 36-1-102(1)(B). As an affirmative defense, parents facing termination may argue that their failure to support a child was not willful. *Id.* § 36-1-102(1)(I). All parents over the age of eighteen are presumed to know of their legal obligation to support their children. *Id.* § 36-1-102(1)(H).

It is undisputed that Father paid no support for the Child while she was in DCS custody. The only question, then, is whether Father's failure to support was willful. While Father asserts on appeal that the failure was not willful, we conclude that this argument is waived because it was not raised in any pleading in the trial court, and Father has not argued on appeal that the issue was tried by consent. *See In re Jaidon S.*, No. M2021-00802-COA-R3-PT, 2022 WL 1017230, at *5 (Tenn. Ct. App. Apr. 5, 2022) (concluding that the mother's argument regarding willfulness was waived where it was not raised in a pleading in the trial court and mother did not argue on appeal that willfulness was tried by consent) (citing *In re Christopher L.*, No. M2020-01449-COA-R3-PT, 2021 WL 4145150, at *5 (Tenn. Ct. App. Sept. 13, 2021); *In re Ashlynn H.*, No. M2020-00469-COA-R3-PT, 2021 WL 2181655, at *4 (Tenn. Ct. App. May 28, 2021)).

Accordingly, the trial court did not err in finding, by clear and convincing evidence, that Father failed to support the Child. We affirm the trial court's holding as to this ground for termination.

### 2. *Abandonment by Failure to Visit*

Like failure to support, abandonment through failure to visit occurs when, "for a period of four (4) consecutive months," the parent does not "visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Token visitation is visitation that, "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child[.]" *Id.* § 36-1-102(1)(C). A lack of willfulness is also an affirmative defense to abandonment by failure to visit. *Id.* § 36-1-102(1)(I).

Here, Father was limited to phone calls with the Child during the relevant period[8] due to COVID-19 restrictions. The trial court found that the phone calls Father did make amounted only to token visitation:

> Father participated in only token [visitation] with the child during the four-month period. Father was permitted to have supervised visitation with the child during the four-month period preceding the filing of the Petition; however, in-person visits were suspended due to the global pandemic. While the Court took note of the global pandemic and understands the difficulty and strain placed on families trying to maintain contact, in this matter, three phone calls over a total of 13 that could have occurred is simply not enough.

We disagree with the trial court and conclude that DCS failed to show by clear and convincing evidence that the visitation Father engaged in was token. Ms. Eyler testified that Father had a standing phone call with the Child every Thursday night. Ms. Eyler also testified that the only phone call that occurred during the relevant period was on May 28, 2020. It was Ms. Eyler's understanding that Father completed seven phone calls and missed nine during the entire custodial period.

Nonetheless, Ms. Eyler also testified that Foster Mother kept a detailed log of Father's phone calls with the Child.[9] Foster Mother later testified that she believed the last phone call from Father occurred in July or early August of 2020. When asked about how many phone calls Father made, Foster Mother testified that Father made "approximately eight or nine." It is unclear whether Foster Mother was referring to the relevant four-month period or the custodial period entirely when she made this statement. In light of this testimony, it is unclear how the trial court reached the factual conclusion that Father engaged in, at most, three phone calls with the Child. Respectfully, the record is unclear on this point and therefore does not support the trial court's finding.

Notably, counsel for DCS admitted in his closing statement that the evidence regarding "the timeframes of visitation stopping" conflicted. We agree with DCS in this regard and cannot say that the foregoing amounts to clear and convincing evidence of a failure to visit. In this particular case, once a week phone calls were the only available mode of communication between Father and the Child. Consequently, unequivocal evidence regarding the number of phone calls made was imperative here. The clear and convincing standard demands that "the facts are established as highly probable, rather than as simply more probable than not." *In re Carrington H.*, 483 S.W.3d at 522. Because the record does not definitively establish the extent of the communication

---

[8] The four-month period immediately preceding the filing of the petition was May 9, 2020, through September 9, 2020.

[9] Foster Mother's log was not offered into evidence.

between Father and the Child during the relevant four-month period, DCS did not meet its burden as to this ground.

The termination of Father's parental rights for abandonment by failure to visit is therefore reversed.

### C. Substantial Noncompliance with the Permanency Plan

Parental rights may be terminated for "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Making this determination entails "more than merely counting up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). This ground is not established simply by showing "that a parent has not complied with every jot and tittle of the permanency plan." *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *8 (Tenn. Ct. App. Jan. 16, 2020) (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

DCS bears the burden of showing "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). DCS must also establish "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citations omitted). If the trial court does not make a finding with respect to the reasonableness of the parent's responsibilities under the permanency plan, the reviewing court must review this issue *de novo*. *See In re Valentine*, 79 S.W.3d at 547.

In this case, the trial court found that "the steps on the Permanency Plan are reasonabl[y] crafted to remedy the situation that brought the [C]hild into DCS custody." The trial court then explained:

> To date, Father has not substantially complied with the permanency plan. Father provided testimony that he has been working, in some capacity, during the entire case. He reported that he was doing some odd jobs for cash and that he recently came into work with a contractor and is making a decent weekly income. Likewise, Father testified that he completed a drug and alcohol assessment at one of his previous residences. However, this Court has not seen a single paycheck/stub and has never seen the results or recommendations of the assessment. Certainly, even if these two things had been done, Father had not provided stable housing and did

not prove his ability to care for the child through child support payments, and this Court cannot say for certain what, if any, recommendations may have existed on the assessment results. Although Father testified that he had worked on some steps, without further proof - some of which would have been easily obtained - this Court does find that Father's work falls short and that he is in substantial noncompliance.

We agree with the trial court that this ground was proven by DCS through clear and convincing evidence. First, the plan requirements were "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Carrington H.*, 483 S.W.3d at 537 (quoting *In re Valentine,* 79 S.W.3d at 547). The Child was originally removed from Mother due to substance abuse in the home; the Child was then removed from Father because Father continued to bring the Child around Mother and expose the Child to drugs. The record establishes that the family lived a transient, unstable lifestyle, and the requirements in the Plan address that. For example, the Plan required that Father establish his own stable living situation, undergo drug and alcohol assessments, and take parenting classes.

Nonetheless, Father completed very few, if any, of the Plan's requirements, and those components Father claims to have completed were never verified to DCS. At the time of trial, Father was living in a house with several other people and admitted that it was not suitable for the Child. Father never indicated to DCS that he had established a home suitable for the Child so that DCS could do a home inspection. Father also claimed to be working several days a week but never provided DCS with proof of employment or income as required by the Plan. To that point, Ms. Eyler testified that Father informed her he could not complete the Plan's requirements due to working all day every day. Father testified at trial, however, that during the four months preceding the filing of the petition, he was only working a few days a week. It follows that at least some progress could have been made on the additional Plan requirements, such as the parenting classes and the mental health assessment, during that period.

Additionally, Father avers on appeal that it was difficult to comply with the Plan because it was not provided to him in Spanish and because some of the classes he needed to take were not offered in Spanish. Nonetheless, Ms. Eyler testified that Father told her he could not complete the Plan because he did not have the time, that she and Father communicated over text in English without issue, and that Father never indicated to her that he needed help with the Plan requirements. There is also indication in the record that in 2019, DCS arranged one of the assessments required by the Plan, and Father failed to attend multiple times, resulting in the provider refusing to work with Father.

The foregoing issues are not "[t]rivial, minor, or technical deviations from [the] permanency plan's requirements[;]" rather, the record indicates that Father essentially completed no part of the permanency plan. *In re M.J.B.*, 140 S.W.3d at 656. We agree

with the trial court's conclusion that DCS proved this ground for termination by clear and convincing evidence, and we affirm.

**D. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility**

Tennessee Code Annotated section 36-1-113(g)(14) provides an additional ground for termination when:

> [a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires clear and convincing proof of two elements. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* The statute requires "a parent to manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child. *Id.* at 677. Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, *13 (Tenn. Ct. App. June 20, 2018)).

The trial court found that DCS proved this ground by clear and convincing evidence, noting Father's own testimony that he was unable to assume custody of the Child due to his living situation. We take no issue with this finding, and the first prong of section 36-1-113(g)(14) is clearly satisfied.

However, the trial court made no findings with regard to the second prong of section 36-1-113(g)(14), which requires a finding that "placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." Both elements of the statute must be proven by clear and convincing evidence. *In re Neveah M.*, 614 S.W.3d at 674.

There is no mention of the second statutory element in the trial court's order, and DCS does not address this omission on appeal. Accordingly, the trial court failed to make sufficient findings of fact and conclusions of law with regard to this ground for

termination, and the ruling must be vacated. *In re Adaleigh M.*, No. E2019-01955-COA-R3-PT, 2021 WL 1219818, at *8 (Tenn. Ct. App. Mar. 31, 2021) (vacating trial court's decision as to this ground where trial court did not address second prong of statute); *In re Mickeal Z.*, No. E2018-01069-COA-R3-PT, 2019 WL 337038, at *14 (Tenn. Ct. App. Jan. 25, 2019) (same). While often a trial court's failure to render sufficient findings of fact and conclusions of law warrants a remand, here it is unnecessary because other statutory grounds support termination of Father's parental rights. *In re Adaleigh M.*, 2021 WL 1219818, at *9.

Consequently, the trial court's holding terminating Father's parental rights pursuant to Tenn. Code Ann. section 36-1-113(g)(14) is vacated.

## II. Best Interests

In addition to proving at least one statutory ground for termination, a party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination is in the child's best interests. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)). Rather, our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interests analysis is not the parent but rather the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective.").

We consider nine statutory factors when analyzing best interests:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

This list is non-exhaustive.[10] *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 877).

In this case, factor six, which addresses abuse in the removal home, is squarely at issue. The trial court admitted hearsay testimony from the Child's foster mother regarding disclosures of abuse made by the Child after her removal from Father. While we have already determined that we need not reach the issue of severe abuse as a ground for termination, there is still a dispute as to whether this testimony was admissible for purposes of the best interests analysis. We therefore turn to this question before examining the remaining factors in Tenn. Code Ann. § 36-1-113(i).

---

[10] The Tennessee General Assembly recently amended the statutory best interest factors provided in Tennessee Code Annotated section 36-1-113(i). *See* 2021 Tenn. Pub. Acts, ch. 190 § 1. This amendment does not affect the instant case because we apply the version of the statute in effect at the time the petition for termination was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

The decision to admit or deny testimony is soundly within the discretion of the trial court, and trial courts are "accorded a wide degree of latitude" in this determination. *In re Azhianne G.*, No. E2020-00530-COA-R3-JV, 2021 WL 1038208, at \*3 (Tenn. Ct. App. Mar. 18, 2021) (quoting *In re Madison M.*, No. M2013-02561-COA-R3-JV, 2014 WL 4792793, at \*3 (Tenn. Ct. App. Sept. 25, 2014)). A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision which is against logic or reasoning and which causes an injustice to the complaining party. *Doe ex rel. Doe v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 42 (Tenn. 2005) (citing *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001)).

The discretionary decision at issue here was the trial court's decision, over objections from Father's counsel, to admit hearsay testimony from Foster Mother. "Hearsay is not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. The following are not excluded by the hearsay rule:

> **(25) Children's Statements.** Provided that the circumstances indicate trustworthiness, statements about abuse or neglect made by a child alleged to be the victim of physical, sexual, or psychological abuse or neglect, offered in a civil action concerning issues of dependency and neglect pursuant to Tenn. Code Ann. § 37-1-102(b)(12), issues concerning severe child abuse pursuant to Tenn. Code Ann. § 37-1-102(b)(21), or issues concerning termination of parental rights pursuant to Tenn. Code Ann. § 37-1-147 and Tenn. Code Ann. § 36-1-113, and statements about abuse or neglect made by a child alleged to be the victim of physical, sexual, or psychological abuse offered in a civil trial relating to custody, shared parenting, or visitation. Declarants of age thirteen or older at the time of the hearing must testify unless unavailable as defined by Rule 804(a); otherwise this exception is inapplicable to their extrajudicial statements.

Tenn. R. Evid. 803(25).

Here, the Child is under thirteen years of age, and there was an allegation of sexual abuse made during a proceeding to terminate parental rights. Accordingly, the trial court could properly allow Foster Mother's statements regarding the Child's disclosures as long as the circumstances "indicate[d] trustworthiness." Tenn. R. Evid. 803(25); *see also In re L.M.H.*, No. E2017-00604-COA-R3-PT, 2017 WL 4331037, at \*4 (Tenn. Ct. App. Sept. 28, 2017) ("This Court has stated that 'the determination of trustworthiness is a matter for the trial court to decide and that decision will not be disturbed on appeal unless there is a showing of abuse of discretion.'" (quoting *State Dept. of Human Servs. v. Purcell*, 955 S.W.2d 607, 609 (Tenn. Ct. App. 1997)).

Foster Mother's testimony was that on two different occasions, the Child stated to

Foster Mother that "Franco likes my whooha." Foster Mother described the first occasion as follows:

> A. We were at home. [The Child] and my grandson were using markers to do tattoos on their arms. And I was sitting with my oldest one doing homeschool work. And they came running to me, you know, saying they wrote on theirselves and they were ready to show me their tattoos. And [the Child] said, Anthony wrote on my whooha. And I said how did that happen? She said she wanted him to see her whooha. And I said why? She said he wrote it on right here. And it was not -- it was actually on her stomach. And I said --
>
> Q. Just for clarification for the Court's purposes, what is a whooha?
>
> A. Yeah, that's what I was getting to. I asked her, what is a whooha, and she pointed to her vaginal area. And I said, why would you want him to do that. And she said, Franco likes it.
>
> Q. Okay. And to be clear, who is she referring when she says Franco?
>
> A. [Father] is who she calls Franco.

When asked whether the Child had ever made similar disclosures on a different occasion, Foster Mother explained:

> The only other thing she has said is she was in the bathroom and she had told me that – I try to teach them early to wash their private areas, especially when they're foster kids and you don't know what they've been through. So she was -- I was trying to teach her how to wash her privates and she proceeded to tell me that Franco liked her whooha. And she also told me that Cindy put clippies. And that's what she said. Put clippies on her whooha. And she did her little hands like that (demonstrating). And I said what kind of clippies? She said, you know, just clippies. And I said, I'm sorry, we're – we're taught in our foster parent classes to not question these kids and not push an agenda because we don't know what they're talking about. And so I just kind of let her talk. And she said that -- I said, I'm sorry that happened. And she said, it's okay, we got to go to the pool at the hotel. And she said it still hurt but it was fun.

At trial, Father's counsel argued that the circumstances did not indicate trustworthiness because the Child underwent forensic interviews and did not disclose abuse during those interviews. The trial court disagreed and found that the circumstances did indicate trustworthiness. Having reviewed the record, we conclude that the trial court did not

abuse its discretion in admitting the above statements.

First, other evidence in the record corroborates the hearsay statements. *See* Tenn. R. Evid. 803(25) Adv. Comm'n. Cmt. ("[W]orthy of consideration is the presence or absence of evidence corroborating the hearsay statement"). It is undisputed that the Child had to be removed from a prior foster placement in part due to putting her hands down another child's pants. Foster Mother also testified that the Child tended to be "touchy feely" with men. *See In re Malichi C.*, No. E2009-00055-COA-R3-PT, 2009 WL 3270178, at *10 (Tenn. Ct. App. Oct. 13, 2009) (noting additional evidence about child's "inappropriate sexual behavior" when considering the trustworthiness of hearsay statements under Rule 803(25)). Further, while Father makes much of the fact that the Child never disclosed abuse during her forensic interviews, this argument does not provide a full picture of the evidence. When testifying about the forensic interviews, Ms. Eyler stated that the Child shut down completely when asked about abuse and would not speak at all. Foster Mother then testified that after one of the forensic interviews, the Child had an extreme episode in which she threw a bowl of cereal at Foster Mother and stated to Foster Mother, "you told those people my secrets." The Child then crawled under the table and threw more cereal at Foster Mother. Accordingly, the absence of an additional disclosure during a forensic interview is not dispositive. When taken as a whole, the foregoing events corroborate the Child's disclosures to Foster Mother. *See id.*

We are likewise unpersuaded by Father's argument that the circumstances cannot indicate trustworthiness because the disclosures were purportedly made to Foster Mother, who wishes to adopt the Child. Father's assertion is generic and without citation to specific evidence. Moreover, we have previously rejected the argument that, without more, the circumstances of an abuse disclosure lack trustworthiness when made to a custodian who wishes to keep the child. *See, e.g.*, *In re Alyssa W.*, No. E2017-00070-COA-R3-PT, 2017 WL 6403569, at *9 (Tenn. Ct. App. Dec. 14, 2017); *In re Samuel D.*, 536 S.W.3d 447, 456 (Tenn. Ct. App. 2016).

It was well-within the trial court's discretion to evaluate the circumstances of the Child's disclosure and admit Foster Mother's testimony. We find no abuse of discretion.

Returning to the best interests analysis, factor six of section 36-1-113(i) weighs heavily in favor of termination here. Looking to the remaining factors, several others militate in favor of termination. As addressed at length above, Father made little to no progress in adjusting his circumstances to make them appropriate and suitable for the Child. *See* Tenn. Code Ann. § 36-1-113(i)(1),(2). By the time of trial, Father's living situation remained unstable, and he admitted he could not bring the Child to the home he currently resided in. Father did not have a driver's license or a transportation plan for taking the Child to school, doctor's appointments, etc. While Father maintains that DCS did not sufficiently assist him in making the requisite changes, the record reflects that Father failed to communicate with DCS regarding his needs. Accordingly, the first two

factors favor termination of Father's parental rights.

As to Father's visitation, we have already explained that the evidence is sparse. *See id.* § 36-1-113(i)(3). We also consider that during most of the custodial period, visitation was limited due to COVID-19 restrictions. Under the particular circumstances of this case, we cannot conclude that factor three favors termination. Notwithstanding visitation, it is clear from the record that Child has a strained, if existent at all, relationship with Father. *See id.* § 36-1-113(i)(4). Both Ms. Eyler and Foster Mother testified that the Child refers to Father merely as "Franco," and rarely asks about him. Foster Mother also testified that the Child exhibited behavioral problems and aggravation after her phone calls with Father. Accordingly, factor four militates in favor of termination.

The next factor addresses the effect a potential change in caretakers might have on the Child. *See id.* § 36-1-113(i)(5). Ms. Eyler's position at trial was that a change in caretakers would be detrimental to the Child, inasmuch as she was bonded to the Foster Family and showing improvement in her present circumstances. Father offered no countervailing evidence to this point. We also find it particularly persuasive in this case that the Child's sibling has been adopted by the Foster Family and that the two children are close in age and share a bond. As such, factor five also favors termination. *See id.*

As addressed at length already, factor six weighs heavily in favor of termination. *See id.* § 36-1-113(i)(6). Stated simply, both the Child's disclosures and the corroborating circumstances are disturbing. The strong possibility of abuse also lends itself to factor seven, addressing the physical condition of the parent's home. *Id.* § 36-1-113(i)(7). Moreover, Father conceded at trial that his current living situation was not suitable for the Child, and Father has a history of leaving the Child in the care of known drug users including Mother. *See id.* In light of the foregoing, factors six and seven both heavily favor termination. Insofar as the record establishes very little about Father's present mental and emotional state, however, factor eight favors neither party. *See id.* § 36-1-113(i)(8). Finally, it is undisputed that Father has never paid support for the Child, and the final factor therefore favors termination. *See id.* § 36-1-113(i)(9).

Based on all of the foregoing, we agree with the trial court that termination of Father's parental rights is in the Child's best interests. We therefore affirm the termination of Father's parental rights pursuant to Tenn. Code Ann. § 36-1-113.

## CONCLUSION

The judgment of the trial court is reversed as to the termination of Father's parental rights for severe abuse and abandonment by failure to visit. *See* Tenn. Code Ann. § 36-1-113(g)(1), (4). The judgment is modified to vacate the trial court's holding that Father's parental rights are terminated pursuant to Tenn. Code Ann. § 36-1-

113(g)(14). As to all other issues, including the overall termination of Father's parental rights, the judgment of the Juvenile Court for Cocke County is affirmed. Costs of this appeal are taxed to the appellant, Francisco Q., for which execution may issue if necessary.

_____

KRISTI M. DAVIS, JUDGE